United States District Court
Southern District of Texas
**ENTERED**
October 26, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| WILBERT J. LIMA, ET AL. § | |
| § | |
| Plaintiffs. § | |
| § | |
| VS. § | CIVIL ACTION NO. 3:16–CV–00074 |
| § | |
| CHARLES WAGNER, ET AL. § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND RECOMMENDATION

In this civil rights lawsuit, Plaintiff Wilbert J. Lima ("Lima") alleges he was denied adequate medical treatment in violation of his constitutional rights when he was incarcerated in the Brazoria County Detention Center. Lima brings a cause of action under 42 U.S.C. § 1983 against a number of defendants, including Brazoria County Sheriff Charles Wagner ("Sheriff Wagner") in his individual capacity.

Sheriff Wagner has filed a Motion for Summary Judgment-Qualified Immunity ("Motion for Summary Judgment") (Dkt. 215), which has been referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Dkt. 268. In addition to opposing Sheriff Wagner's Motion for Summary Judgment, Lima has filed a separate Motion to Strike and Objections to Defendant's Reply Exhibits in Dkt. 289 ("Lima's Motion to Strike"), seeking to strike the 10 exhibits attached to Sheriff Wagner's reply brief in support of his Motion for Summary Judgment. Dkt. 292. Lima's Motion to Strike has been referred to this Court pursuant to 28 U.S.C. § 636(b)(1)(A). Dkt. 295.

## FACTUAL BACKGROUND

Lima entered the Brazoria County Detention Center ("Jail") on February 10, 2014, to begin serving a sentence for a driving while intoxicated conviction. Lima brought with him to Jail his own supply of Xanax in a prescription bottle. Xanax is a brand name for the drug Alprazolam and is commonly used to treat anxiety and panic disorders. Xanax is a highly addictive medication, which can cause serious withdrawal symptoms like seizures and delirium if discontinued abruptly.

Lima also brought with him to Jail a letter from his physician explaining that he had been diagnosed with recurrent panic attacks and insomnia, and outlining a prescription protocol using 2 mg of Xanax at bedtime. The letter stated that Lima "has been stable with this therapy." Dkt. 284-1. Lima claims that the intake nurse at the Jail accepted and inventoried the medication and physician's note before releasing him to the general population.

Lima contends that he became concerned when he did not receive his Xanax medication. On his second day in custody, Lima completed several "Sick Call Request" forms, describing his deteriorating physical and mental condition, and requesting that Jail personnel immediately provide his Xanax prescription and medical care. Because medical providers at the Jail prohibited Lima from accessing his Xanax prescription and administered no reasonable substitutes, Lima claims he suffered withdrawal symptoms due to the abrupt discontinuation of his medicine. These withdrawal symptoms included elevated blood pressure, rapid heart rate, excessive sweating, anxiousness, confusion, hallucinations, altered mental status, diarrhea, and vomiting.

On February 15, 2014, his fifth day in custody, Lima was taken to Angleton-Danbury Hospital, where he was diagnosed with, among other things, altered mental status, memory loss, and anxiety disorder. After three days at the hospital, Lima was sent back to Jail with a new Xanax prescription and instructions to resume the medication. Lima claims that Jail personnel never provided him the prescribed Xanax while he was at the Jail. Instead, Jail personnel provided Lima with Librium, as a substitute for Xanax, for four days during his 18-days of incarceration.

In his role as sheriff, Sheriff Wagner, a 49-year veteran of law enforcement, has the overall responsibility over Jail operations. Brazoria County has a medical contract with J. Allen & Associates of Texas, LLC ("J. Allen & Associates"), a third-party medical provider, to supply the medical needs at the Jail. As part of its medical services, J. Allen & Associates provides nurses on duty 24 hours a day/7 days a week and doctors who visit the Jail on a regular basis to treat inmates.

The parties agree that Section 8.09.4 of the Brazoria County Sheriff's Department Jail Manual ("Jail Manual") governs the control of medication at the Jail. It expressly provides that medications prescribed by a doctor should be securely stored, appropriately verified, and then personally administered to the inmate. Section 8.09.4 of the Jail Manual states, in its entirety, as follows:

> **8.09.4 POLICY: CONTROL OF MEDICATION**
> All drugs and medications as well as syringes and needles, are stored securely away from all inmates and are administered only in accordance with a medical doctor's written instructions.
>
> **PROCEDURE**
> The only prescription medications to be administered to an inmate will be those prescribed by a medical doctor or dentist.
> The only persons authorized to dispense drugs and medications for sick call or first aid will be nurses (LVN). This includes syringes and needles. Facility personnel *may* hand out medicine to inmates.
> Used syringes and needles will be placed in a contamination box and disposed of by J. ALLEN & ASSOCIATES personnel.
>
> Records will be maintained of all prescriptions and medications to include current inventory, person dispensing medication, time and date dispensed, and dosage administered.
> 1. All medications prescribed by a doctor or dentist will be kept locked in the medicine locker. No inmate will be allowed access to any drugs or medications.
> 2. Any drugs or medications with the proper prescription label, in the possession of an inmate upon admission, will be confiscated, then stored and marked with the inmate's name until the requirements of the medication can be confirmed and the medication can be verified to be what is claimed. The following procedures will be followed when administering medication:
>     a) The medication will be given to each inmate personally and the inmate will be watched to insure that the medication is swallowed.
>     b) If there is reason to believe that an inmate is not swallowing the medication in an attempt to hoard it, the pills will be crushed, or the capsules emptied into water cup and dissolved, and the inmate is required to drink the solution. A doctor or pharmacist will be contacted beforehand to verify that the effects of the medication will not be altered by this procedure.
>     c) Alternatively, if the inmate is found to be hoarding medication, a standing infirmary order is to temporarily discontinue the medication until a physician re-instates the medication.
>
> If an inmate refuses to take medication or drugs prescribed by a doctor or dentist, this will be noted in the inmate's medical record and a release form should be signed by the inmate.

Dkt. 284-7 at 22.

Despite the clear and unequivocal language in the Jail Manual concerning the proper procedure for the administration of medicine prescribed by a doctor, Lima alleges that there was an unwritten policy at the Jail that prohibited inmates from receiving Xanax. Under this so-called "no-Xanax" policy, Jail officials allegedly refused to provide inmates with Xanax even if they had a lawful prescription. Sheriff Wagner denies knowledge of any unwritten policy that prohibited certain drugs from being given to patients, and there is no summary judgment evidence that remotely suggests he was aware of any such policy. *See*

4

Dkt. 284-8 at 9 ("I don't know of any [prohibited drug] list. If the list exists, it is not to my knowledge."). Sheriff Wagner readily admits that he has no medical training and says that is why he left all medical decisions, including the administering of medications, to the doctors who are under contract with the county.

Lima claims that he has not returned to his previous mental state since his release from Jail. He alleges that he has been unable to keep a job because his short-term memory loss prevents him from complying with Occupational Safety and Health Administration safety standards. Lima suffered a stroke on December 8, 2015, and he claims that the stroke was caused by the deprivation of his prescribed medication while at the Jail.

The gravamen of Lima's constitutional claim is that he was denied Xanax and the appropriate treatment for his mental illness. Specifically, Lima claims that his Eighth Amendment right to be free from cruel and unusual punishment has been violated. Lima has also asserted a medical negligence claim against two of the doctors employed by J. Allen & Associates. In his Motion for Summary Judgment, Sheriff Wagner argues that he is entitled to qualified immunity from the Eighth Amendment claim asserted against him in his individual capacity.

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is required when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, (1986).

Typically, on a summary judgment motion, the moving party bears the initial burden of showing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates an absence of evidence supporting the nonmoving party's case, then the burden shifts to the nonmoving party to come forward with specific facts showing that a genuine issue for trial does exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In civil rights actions such as this one, however, a government official's good faith assertion of a qualified immunity defense alters the usual summary judgment burden of proof. *See Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010). Once the government official asserts qualified immunity, the plaintiff has the burden to show there is a genuine and material dispute as to whether qualified immunity applies. *See Thompson v. Upshur Cty.*, 245 F.3d 447, 356 (5th Cir. 2001) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.") (citations and internal quotation marks omitted); *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987) ("Once the defendant asserts [qualified immunity], the burden shifts to the plaintiff to rebut it."); *Dennis v. Martin*, 2:15-CV-0330, 2018 WL 3598770, *2 (N.D. Tex. June 22, 2018) ("A qualified immunity defense, however, alters the usual summary judgment burden of proof, such that governmental employees need only assert the defense in good faith, putting forth no evidence, to shift the burden to the non-movant to show the defense does not apply.").

When evaluating whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrain[s] from making credibility

determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008). In so doing, the court must draw all reasonable inferences in favor of the nonmoving party, even on a summary judgment motion based on qualified immunity. See *Brown*, 623 F.3d at 253 ("The plaintiff bears the burden of negating qualified immunity, but all inferences are drawn in his favor.").

## EVIDENTIARY OBJECTIONS

Before considering the merits of Sheriff Wagner's Motion for Summary Judgment, the Court must address Lima's objections to Sheriff Wagner's summary judgment evidence. Lima objects to selected documents attached to Sheriff Wagner's Motion for Summary Judgment, as well as to all 10 documents attached to Sheriff Wagner's reply brief in support of his Motion for Summary Judgment.

**A.    Objections to Documents Attached to Sheriff Wagner's Motion for Summary Judgment**

Lima objects to exhibits 2, 5, 6, 9, 14, 15, and 20 attached to Sheriff Wagner's Motion for Summary Judgment. Lima claims that these exhibits are not in admissible form. Under Rule 56(c)(2), which was amended in 2010, documents in inadmissible form may, nonetheless, be considered as competent summary judgment evidence if the proponent demonstrates the document could be put into admissible form for trial. *See LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016) ("At the summary judgment stage, materials cited to support or dispute a fact need only be *capable* of being 'presented in a form that would be admissible in evidence.'") (quoting FED. R.

7

CIV. P. 56(c)(2)). The Advisory Committee Notes on Rule 56 explain that "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." FED. R. CIV. P. 56 advisory committee's note to 2010 amendment. Here, Sheriff Wagner has adequately explained how he can produce the challenged summary judgment exhibits in admissible form:

> Defendant can present the documents in admissible form by submitting Exhibits 2, 6, and 9 with business record affidavits attached, submitting all pages with the business record affidavits attached for Exhibits 14 and 15 and submitting the relevant portions of Exhibits 5 and 20 with the certification page attached.

Dkt. 289 at 18–19. Because Sheriff Wagner has sufficiently described how he can place the challenged information in admissible form, the exhibits are competent summary judgment evidence that this Court may consider when deciding the merits of Sheriff Wagner's Motion for Summary Judgment. *See Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) ("Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible, the material may be presented in a form that would not, in itself, be admissible at trial.") (citation and internal quotation marks omitted). Therefore, Lima's objections to exhibits 2, 5, 6, 9, 14, 15, and 20 attached to Sheriff Wagner's Motion for Summary Judgment are **OVERRULED**.

**B.     Objections to the 10 Exhibits Attached to Sheriff Wagner's Reply Brief in Support of his Motion for Summary Judgment**

Lima's Motion to Strike challenges the admissibility of all 10 exhibits attached to Sheriff Wagner's reply brief in support of his Motion for Summary Judgment. In

contesting the admission of these documents, Lima lodges a number of objections, including an argument that it is impermissible for Sheriff Wagner to introduce new evidence at the reply stage of a summary judgment proceeding. Although the Fifth Circuit has recognized that "a district court may rely on argument and evidence presented for the first time in a reply brief as long as the court gives the non[-]movant an adequate opportunity to respond," the Court need not go down that road. *Vais Arms, Inc. v. Vais*, 383 F.3d 287, 292 n.10 (5th Cir. 2004) (collecting cases). To provide Lima a chance to respond to the evidence attached for the first time in the reply brief would only unnecessarily delay these proceedings. Because, as more fully discussed below, the Court believes summary judgment is appropriate regardless of whether it considers the challenged 10 exhibits, the more appropriate course of action is to simply not consider the 10 exhibits attached to the reply brief when deciding the pending summary judgment motion. Lima's Motion to Strike is, therefore, **GRANTED**.

## ANALYSIS

### A. Qualified Immunity: the Legal Standard

Section 1983 authorizes a private cause of action against any person who, under color of state law, causes another to be deprived of a federally-protected right.[1] This means

---

[1] Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983.

that individual governmental employees can be sued for acts that violate the United States Constitution. "The purpose of [Section] 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254–57 (1978)).

"The doctrine of qualified immunity serves to shield a government official from civil liability for damages based upon the performance of discretionary functions . . . ." *Upshur Cty.*, 245 F.3d at 456. Under this longstanding doctrine, government officials sued in their individual capacity under Section 1983 are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citation omitted). *See also Bryant v. Tex. Dep't of Aging & Disability Servs.*, 781 F.3d 764, 770 (5th Cir. 2015) ("Generally, government officials are immune from civil damages if their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known.") (citation and internal quotation marks omitted). The qualified immunity doctrine reconciles two competing interests:

> One interest is the compensation of persons whose federally protected rights have been violated. Opposing this is the fear that personal liability will inhibit public officials in the discharge of their duties. Qualified immunity has therefore been recognized to protect "all but the plainly incompetent or those who knowingly violate the law."

*Johnston v. City of Houston*, 14 F.3d 1056, 1059 (5th Cir. 1994) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Qualified immunity gives government officials breathing

room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

The Supreme Court has recognized a two-pronged approach for resolving government officials' qualified immunity claims. "First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citations and internal quotation marks omitted). Courts are free to decide in which order to address the two prongs of the qualified-immunity analysis. *See id.* at 236.

**B.     Sheriff Wagner's Motion for Summary Judgment**

In his Motion for Summary Judgment, Sheriff Wagner contends that Lima has failed to establish a violation of a clearly established constitutional right. According to Sheriff Wagner, Lima readily admits that he received medical care while incarcerated in the Jail; he simply disagrees with the type of medical care he received. That, Sheriff Wagner argues, does not rise to the level of an actionable constitutional violation.

Noting that personal involvement is an essential element of a civil rights cause of action, Sheriff Wagner also argues that there is no evidence that he was personally involved in the decision to treat Lima or administer any medications, nor were his actions causally

connected to the alleged constitutional deprivation.[2] As such, Sheriff Wagner maintains that there is no legal basis for Lima's Section 1983 claim against him.

### C. Personal Involvement and Supervisory Liability

In determining whether qualified immunity applies to Sheriff Wagner's actions, the Court will tackle the first prong of the qualified immunity analysis: Has Lima adduced some evidence supporting the violation of a constitutional right by Sheriff Wagner.[3] The Court can resolve this question by exploring Sheriff Wagner's argument that he is entitled to qualified immunity because he was not personally involved in the alleged constitutional violation.

As a preliminary matter, it is undisputed that Sheriff Wagner had no personal contact with Lima or direct knowledge of Lima's treatment by Jail officials. Lima's individual capacity claim against Sheriff Wagner is, therefore, predicated on a supervisory-liability theory. "A plaintiff in a civil rights case must demonstrate not only a constitutional

---

[2] Some courts have found that a supervisor is entitled to qualified immunity because absent personal involvement, he or she did not violate the plaintiff's constitutional rights at the first step of the qualified immunity inquiry. *See Brumfield v. Hollins*, 551 F.3d 322, 329–30 (5th Cir. 2008). Other courts looking at the personal involvement issue have skipped the two-prong qualified immunity analysis, simply holding that a supervisor without personal involvement in the alleged constitutional violation cannot be liable under Section 1983. *See Weathers v. Cano*, 392 F. App'x 339, 341 (5th Cir. 2010). Although both approaches reach the same ultimate result, the Court believes the proper analytical framework requires a court to evaluate the personal involvement issue as part of the qualified immunity analysis.

[3] Because, as discussed below, the Court finds no evidence to support the violation of a constitutional right by Sheriff Wagner, the Court need not address the second step of the qualified immunity analysis: whether "the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question." *Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007).

violation, but also personal involvement on behalf of those alleged to have violated the plaintiff's constitutional rights." *Garrett v. Sulser*, No. 6:17-CV-310, 2018 WL 1192996, at *3 (E.D. Tex. Mar. 7, 2018). *See also Murphy v. Kellar*, 950 F.2d 290, 292 (5th Cir. 1992) (a plaintiff must "specify the personal involvement of each defendant" in a Section 1983 action); *Thompson v. Steele*, 709 F.2d 381, 382 (5th Cir. 1983) ("Personal involvement is an essential element of a civil rights cause of action").

It is black-letter law that supervisory officials like Sheriff Wagner cannot be held liable for civil rights violations allegedly committed by their subordinates on a theory of strict or vicarious liability. *See Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691–95 (1978) (holding that supervisory officials cannot be held vicariously liable for their subordinates' actions under Section 1983); *Rios v. City of Del Rio*, 444 F.3d 417, 425 (5th Cir. 2006) ("There is no vicarious or *respondeat superior* liability of supervisors under [S]ection 1983.") (citation omitted); *Abate v. S. Pac. Transp. Co.*, 993 F.2d 107, 110 (5th Cir. 1993) ("It is well settled that there can be no respondeat superior liability in a [Section] 1983 claim."); *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987) ("Under Section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability.").

In *Ashcroft v. Iqbal*, 556 US. 662 (2009), the Supreme Court expressly rejected an argument that government officials may be held liable under Section 1983 because they merely had knowledge of their subordinate's misconduct. "In a [Section] 1983 suit . . . the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government

official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677.

Under current Fifth Circuit authority, a supervisor may only be held liable if one of the following exists: (1) his personal involvement in the constitutional deprivation, (2) sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations, or (3) the supervisory official implements a policy that itself is a repudiation of civil rights and is the moving force of the constitutional violation. *See Pena v. City of Rio Grande*, 879 F.3d 613, 620 (5th Cir. 2018) (explaining that a plaintiff in a Section 1983 case establishes supervisor liability "if (1) the supervisor affirmatively participates in the acts that cause the constitutional deprivation, or (2) the supervisor implements unconstitutional policies that result in the constitutional injury.") (citation, internal quotation marks, and brackets omitted); *Thompkins*, 828 F.2d at 304 ("[A] supervisor may be held liable if there exists either (1) his personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.").

Importantly, "[i]n order to establish supervisor liability for constitutional violations committed by subordinate employees, plaintiffs must show that the supervisor act[ed], or fail[ed] to act, with *deliberate indifference* to violations of others' constitutional rights committed by their subordinates." *Porter v. Epps*, 659 F.3d 440, 446 (5th Cir. 2011) (citations and internal quotation marks omitted, alterations and emphasis in original). "A prison official acts with deliberate indifference 'only if . . . he knows that the inmates face a substantial risk of serious bodily harm and . . . he disregards that risk by failing to take

reasonable measures to abate it.'" *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006) (quoting *Farmer v. Brennan*, 511 U.S. 825, 847 (1994)). *See also Armant v. Stalder*, 287 F. App'x 351, 353 (5th Cir. 2008) ("A prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment.") (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

In the instant case, Sheriff Wagner contends that there is no summary judgment evidence establishing that he was personally involved in the events giving rise to the alleged constitutional violation. As noted above, it is undisputed that Sheriff Wagner had no personal interaction with Lima at any time during his detention. *See* Dkt. 284-8 at 3 ("Q. Okay. And have you have met the plaintiff Mr. Lima. A. No, ma'am."). Lima argues that Sheriff Wagner *should* have been aware of Lima's treatment by jail officials because of the "Sick Call Request" forms he submitted, but Lima fails to present any evidence to demonstrate that Wagner saw these forms or made any decisions regarding Lima's medical care. In fact, the uncontroverted summary judgment evidence establishes that Wagner did not review the "Sick Call Requests," made no decisions regarding the medical care provided to Mr. Lima, issued no directives related to the medical care provided to Mr. Lima, and had no involvement in any decisions made with respect to the medical care provided to Mr. Lima. *See id.* at 6, 7, 18, 20, 31. Absent any facts establishing personal involvement on Sheriff Wagner's part, there is no valid basis to hold him liable in his individual capacity under Section 1983 simply because he oversaw jail operations. *See Gill v. Mooney*, 824 F.2d 192, 196 (2nd Cir. 1987) (where an inmate does no more than allege that a high level supervisor is liable because of his oversight of the prison, dismissal

is proper); *Thompson v. Crnkovich*, No. 1:16-CV-055-BL, 2017 WL 5514519, at *2 (N.D. Tex. Nov. 16, 2017) ("Without personal involvement or participation in an alleged constitutional violation, or implementation of a deficient policy, the individual should be dismissed as a defendant.").

The Court has carefully reviewed the entirety of the summary judgment record and there is simply no evidence indicating that Sheriff Wagner was responsible in any manner for the creation or implementation of any Jail policy that was "the moving force of the constitutional violation." *Thompkins*, 828 F.2d at 304 (citation and internal quotation marks omitted). To the contrary, the only official written policy identified by the parties is the Jail Manual, which expressly states that inmate prescription medications will be "stored and marked with the inmate's name until the requirements of the medication can be confirmed" and then establishes a procedure to administer the prescription medication to the inmate. Dkt. 284-12 at 7. At its core, Lima's fundamental allegation is that Brazoria County did not follow its written policy and that alleged failure to adhere to the written policy constitutes a constitutional violation for which Sheriff Wagner should be held individually responsible. Lima's argument is without merit. Indeed, it is well-settled in the Fifth Circuit that "[t]he failure of the prison to follow its own policies, including a failure to address prisoner grievances, is not sufficient to make out a civil rights claim." *Richardson v. Thornton*, 299 F. App'x 461, 463 (5th Cir. 2008). According to Sheriff Wagner's deposition testimony, he fully expected county employees and contractors to adhere to the policies set forth in the Jail Manual, a document he maintains is the sole source for policy directives at the Jail. *See* Dkt. 284-8 at 5 ("Q. And so all of your policies

16

would be in that manual that you have implemented? A. Yes, ma'am."); *id.* at 33 ("Q. And that medical section [in the Jail Manual] is to be followed by the medical provider, correct? A. Correct."). The fact that some county employees or contractors ignored the Jail Manual's stated policy on when to properly administer certain prescribed medications to inmates does not automatically create personal liability for Sheriff Wagner as the individual responsible for overseeing Jail operations. *See Thompkins*, 828 F.2d at 305 (the "misconduct of Sheriff Belt's employees cannot be imputed to the sheriff individually"); *id.* at 304 (in the context of an alleged failure to provide adequate medical care, "the existence of a constitutionally deficient policy cannot be inferred from a single wrongful act").

Lima's theory of liability against Sheriff Wagner boils down to a claim that there was an unwritten "no-Xanax" policy in effect at the Jail for which Sheriff Wagner should be held accountable. The problem with Lima's argument is that he has adduced absolutely no evidence that Sheriff Wagner implemented or had knowledge of any "no-Xanax" policy. Facing an uphill climb, Lima contends that Sheriff Wagner adopted and ratified this unwritten policy because he left all medical decisions to the medical providers. This argument does not hold water. The only evidence Lima presents concerning a "no-Xanax" policy is from Daniel Broadway ("Broadway"), a deputy jailer at the Jail. In Broadway's deposition, the following exchange occurred:

> Q: Do you know if Xanax is prohibited in the jail?
> A: Yes. To the best of my knowledge, yes.
> Q: And how do you know that Xanax is prohibited from dispensing in the jail?
> A: Just by hearing the medical staff state that it was not allowed.

17

> Q: And is that—when you say it was not allowed, is that a blanket prohibition against—who told you that?
> A: I don't remember for—I don't remember exactly, I just know it's—it's just a medication that's not allowed.
> Q: Okay. Did you overhear that?
> A: Yes, ma'am.
> Q: And is that a part of the known custom of the jail in Brazoria County?
> A: Yes, ma'am.
>
> . . .
>
> Q: Was there any—were you ever told the reason why Xanax was prohibited in the jail?
> A: No, ma'am.
> Q: And is that blanket across-the-board prohibition against the use and prescription of—he dispensing of Xanax?
> A: As far as I know.

Dkt. 284-10 at 11. Construing the summary judgment evidence and drawing all justifiable inferences in favor of Lima, this testimony merely establishes that there was a prohibition at the Jail against the use of Xanax—in direct contravention of the official policy set forth in the Jail Manual. Lima does not claim—and no summary judgment evidence remotely suggests—that Sheriff Wagner was aware of this unwritten "no-Xanax" policy. Indeed, Broadway's testimony is simply that he "hear[d] the medical staff state that [Xanax] was not allowed," not that Sheriff Wagner had any involvement in establishing or maintaining such a policy. *Id.* This is insufficient to support a showing that Sheriff Wagner affirmatively participated in the acts that caused the alleged constitutional deprivation.

In conclusion, the Court finds that Sheriff Wagner lacks the sufficient personal involvement in an alleged constitutional violation to permit the imposition of liability. Accordingly, the Court recommends that Sheriff Wagner's Motion for Summary Judgment

be **GRANTED** and that Sheriff Wagner be **DISMISSED** as a defendant on the basis of qualified immunity.[4]

## CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court **RECOMMENDS** that Wagner's Motion for Summary Judgment-Qualified Immunity (Dkt. 215) be **GRANTED** and that Sheriff Wagner be **DISMISSED** as a defendant. The Court also **GRANTS** Lima's Motion to Strike (Dkt. 292).

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 26th day of October, 2018.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

---

[4] Lima also argues that the Court should not even consider Sheriff Wagner's Motion for Summary Judgment because it was purportedly filed after the expiration of the deadline to file dispositive motions. That argument is easily dismissed. In June 2017, United States District Judge George C. Hanks, Jr. suspended the deadline for filing dispositive motions until after a ruling on Plaintiffs' Motion for Leave to File an Amended Complaint. A new dispositive motion deadline was never formally entered. As such, the Court believes it is only fair to allow Sheriff Wagner to present his summary judgment position and for the Court to consider and rule on that request.